Eastern Oregon Timber Syndicate v. Commissioner.
Eastern Oregon Timber Syndicate v. Commissioner
Docket Nos. 3186, 3187, 3188.
United States Tax Court
1945 Tax Ct. Memo LEXIS 19; 4 T.C.M. (CCH) 1082; T.C.M. (RIA) 45365; December 7, 1945
S. J. Bischoff, Esq., and R. T. Jacob, Esq., Public Service Bldg., Portland 4, Ore., for the petitioner. Earl C. Crouter, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: The commissioner determined deficiencies in income, excessprofits and declared value excess-profits taxes of petitioner, and 25 percent additions to tax for failure to file returns, as follows: Docket No. 3186
Excess
Year
Income Tax
Penalty
Profits Tax
Penalty
1919
$ 193.26
$ 48.32
1922
37.14
9.29
1932
597.90
149.48
1933
797.00
199.25
$289.82
$ 72.46
1935
158.22
39.56
64.83
16.21
1936
83.77
20.94
91.87
22.97
1937
257.89
64.47
241.03
60.26
$2,125.18
$531.31
$687.55
$171.90
Declared Value
Docket No.
Year
Income Tax
Excess-Profits Tax
Total
3187
1941
$ 881.17
$ 553.88
$ 1,435.05
3188
1942
7,736.57
3,767.03
11,503.60
*20 The issues are whether the respondent erred: (1) in holding that petitioner, during the taxable years, was an association taxable as a corporation; (2) in determining the amount of petitioner's gain from sales of timber and timberlands for the years 1941 and 1942; and (3) in holding petitioner liable for 25 percent delinquency penalties for failure to file returns for the years shown in Docket No. 3186. Findings of Fact Petitioner, an unincorporated syndicate, was organized in 1907. It filed income tax returns for some of the taxable years, as hereinafter noted, with the collector of internal revenue for the district of Oregon. Its founders were Merritt C. Griswold (hereinafter Griswold), a retired banker, and Abbot L. Mills (hereinafter Mills), who was president of the First National Bank of Portland, Oregon, and an officer of the Security Savings and Trust Company, an affiliate. These two institutions were later merged under the name of the First National Bank of Portland and will hereinafter be referred to as the bank. In 1906 Griswold and Mills jointly acquired a large tract of timber lands in Lane County, Oregon, for speculative purposes and disposed of it at a profit *21 within a few months. In 1907 they became interested in Eastern Oregon timber lands located in Grant, Morrow and Umatilla Counties. These lands were in what is sometimes called the "Inland Empire," the largest timber-producing region in the western part of the United States. At that time most of the property was held in small units of 40,80, and 160 acres by the original settlers, who had acquired their title from the United States. Griswold and Mills planned to consolidate these small holdings into a large merchantable tract, or tracts, which it was hoped would make them desirable and attractive to large mill and timber operators, and then to dispose of them at a profit. Before carrying their plan into execution, George Penegor, an experienced cruiser of good reputation, was employed to cruise the entire area in order to determine the quantity of timber standing on each forty-acre unit. In June 1907, Griswold began buying units from the settlors. At the outset Mills contributed $25,000 and Griswold $10,000. Later Mills secured additional capital from friends and relatives in the East, an aggregate of approximately $230,000 being obtained from this source between June 27, 1907 and *22 May 24, 1909. Prior to the latter date there was no writing indicating the basis upon which the funds had been obtained by Mills. On May 24, 1909, the investors were issued certificates reading as follows: "CERTIFICATE OF BENEFICIAL INTEREST "In the Eastern Oregon Timber Syndicate "THIS IS TO CERTIFY, That as the registered holder of this Certificate, has paid to the Security Savings and Trust Company, Portland, Oregon, the sum of Dollars, subject to the following conditions and understanding, to-wit: "1st. That the title to all property purchased by or for this syndicate shall rest in the SECURITY SAVINGS AND TRUST COMPANY, Trustee. "2d. That the proceeds of all subscriptions to this syndicate shall be deposited with the SECURITY SAVINGS AND TRUST COMPANY, subject to the order of Abbot L. Mills and Merritt C. Griswold, to be disbursed by them for the payment of necessary expenses, taxes upon the property and purchase of additional timber lands. "3d. That the SECURITY SAVINGS AND TRUST COMPANY shall deed said land, or any part thereof, on such terms, for such consideration, and to such parties as Abbot L. Mills and Merritt C. Griswold, of Portland, Oregon, shall in writing *23 direct. "4th. In case of the death or disability of either Abbot L. Mills or Merritt C. Griswold, the SECURITY SAVINGS AND TRUST COMPANY is empowered to act as his successor and substitute; and in case of the death or disability of both Abbot L. Mills and Merritt C. Griswold, the SECURITY SAVINGS AND TRUST COMPANY is empowered to act as successor and substitute for both. "5th. The proceeds of any sale or sales shall be disbursed by the SECURITY SAVINGS AND TRUST COMPANY in the following manner and order, to-wit: "(a) To the payment of all legal and necessary expenses, including the reasonable fees of the Trustee. "(b) To the payment to each holder of a Certificate of Beneficial Interest of the proportion that his Certificate bears to the total amount paid into this syndicate, until the face value of each and every Certificate of Beneficial Interest has been paid in full. "(c) To the payment of interest at the rate of eight per centum (8%) per annum on each Certificate of Beneficial Interest; said interest to be computed upon each partial repayment of principal from the date of receipt of subscription, to-wit: , until the date of said repayment, and no longer. "(d) To *24 the payment to Abbot L. Mills and Merritt C. Griswold, share and share alike, of one-third of the unappropriated balance and to each holder of a Certificate of Beneficial Interest, the proportional part of two-thirds of the unappropriated balance that this Certificate bears to the total amount paid into this syndicate. "This Certificate is transferable only on the books of said Security Savings and Trust Company by the registered holder hereof in person or by his attorney thereunto duly authorized. "IN WITNESS WHEREOF, said Security Savings and Trust Company has caused this Certificate to be signed by its President and by its Secretary, and its corporate seal to be affixed at Portland, Ore., the day of 19 . / Secretary / President "(Reverse side) "FOR VALUE RECEIVED, I hereby sell, assign and transfer unto the Beneficial Interest represented by the within Certificate, and do hereby irrevocably constitute and appoint attorney to transfer the same on the books of the "SECURITY SAVINGS AND TRUST COMPANY PORTLAND, OREGON
with full power of substitution in the premises. "Date "In presence of " Transfers of certificates were made from time to time; but they were chiefly *25 from estates of decedents to heirs. In 1941, Griswold sold the certificates owned by him to an associate of E. C. Kerns. Before any certificates were issued approximately $200,000 had been expended in the purchase of timberlands. After May 24, 1909, certificates were issued at or about the time funds were received. Certificate holders subscribed $485,000 in cash, and certificates totalling $20,390 were issued in exchange for the timberlands. The following table shows the expenditures made by petitioner.. Purchase price paid to owners prior
to 3-1-13
$423,558.05
Purchase price paid to owners after
3-1-13
26,065.40
W. L. Slaughter bonus
31,020.07
Expenses prior to 3-1-13
17,611.99
Taxes paid before 3-1-13
4,280.60
Total
$502,536.11
47,416.67 acres of land in the "Inland Empire" were acquired prior to March 1, 1913, and 3,809.74 acres were acquired subsequent thereto. Prior to the issuance of the certificates, Griswold took title to the lands purchased in his own name. After the issuance of the certificates title to all lands was vested in the bank as trustee. During their lifetime Griswold and Mills acted as co-managers of the enterprise. Mills' duties *26 were largely confined to procuring necessary capital. After Mills' death in August, 1927, the bank became a co-manager of the syndicate with Griswold. After Griswold's death in December, 1943, the bank became sole manager. For services rendered as manager, Griswold was paid the following compensation: Date
Amount
Paid
Period Involved
Paid
2/ 9/39
For services from beginning
of syndicate to 2/9/39
$20,000.00
12/31/39
For services 2/9/39 to
12/31/39
675.00
1940
1940
900.00
1941
1941
975.00
For a period of approximately thirty years efforts to dispose of the lands and timber were unsuccessful. During this period some income was realized from leasing portions of the lands for grazing. This income was deposited in a bank account carried by Griswold and Mills, referred to as the "Special" or "Auxiliary" account, was used to defray taxes and other overhead expenses, and any excess was invested in government bonds. Another bank account was carried in the name of "A. L. Mills Special," for the syndicate. The first contract of sale was executed on November 1, 1938, between the bank, acting for petitioner, and the Kinzua Pine Mills Co. Under it *27 the vendor agreed to sell and the vendee agreed to buy "all those certain parcels of land" described in an exhibit attached to the agreement, aggregating 14,403.86 acres, the "consideration therefor * * * [to be] determined by the number of feet of merchantable pine timber thereon * * * at a price per M [1] feet dependent upon the time of payment therefor * * *," in accordance with a schedule set out in the contract. The phrase "merchantable pine timber" was defined "to include all such pine trees as are designated as such from year to year in cruises to be made by Henry Thomas * * *, it being understood that the cruises to be made by him shall be based upon specifications agreed upon by him and the Forest Management Division of the Western Pine Association from year to year." The vendee agreed to pay $2 per M of merchantable pine timber as determined by the cruise, which price was to increase at the rate of $.04 per M every six months after March 31, 1939. The contract called for the deposit of $20,000 as earnest money, which was to be applied as the purchase price of ten million feet of pine timber if and when the vendee complied with the terms and conditions of the contract. For *28 the purpose of determining gain or loss under this contract, the respondent treated each payment as a separate sale. During 1941, petitioner realized $23,957.96 from the sale of 1,712 acres of timberlands, including timber, under the contract referred to in the preceding paragraph. These lands had been purchased by it prior to March 1, 1913. During 1942, petitioner realized $22,700.80 from the sale of 1,456 acres under the same contract, 1,296 of which had been acquired prior to March 1, 1913, and 160 subsequent to that date. The cost of the 160 acres was $1,579.38. A second contract was executed by the Kinzua company and the bank, acting for petitioner, under date of October 24, 1940. Therein the vendor agreed to sell and the vendee agreed to buy "all the lands and timber on those lands," aggregating 4,787.23 acres and described in an attached schedule "at a price to be fixed by a cruise mutually conducted by the parties." The vendee agreed to pay $2 per M of merchantable pine with at least 14inch butt, waist high, and 8inch tops. This contract called for a down payment of $10,000, which was to constitute a *29 guarantee fund, and provided that in addition the vendee should pay $5,000 every six months after date of contract until the whole purchase price should be paid. For the purpose of determining gain or loss this sale was treated by the respondent as an installment sale. The total consideration to be received under this contract is $72,188, sales cost (cruising) is $750.04, and net selling price $71,437.96. Of the 4,787.23 acres sold, 4,629.05 were acquired prior to March 1, 1913, and 158.18 subsequent to that date. The cost of the 158.18 acres was $600. Payments received under this contract during 1941 amounted to $10,000. During 1942, payments received amounted to $10,090 out of which collection fees were paid to the bank in the amount of $50.45. Under date of December 31, 1939, the bank entered into an agreement with E. C. Kerns (Pilot Rock Lumber Co.) which provided that the vendor should sell and the vendee purchase "all lands and timber upon those lands * * * [aggregating 19,288.5 acres] * * * at a price to be fixed by a cruise mutually conducted by the parties." The contract provided that cruisers should include all sound trees down to those with 14inch butts and 8inch tops *30 and that dead timber should not be included. The purchase price specified for the timber (the land being also included) was Two Dollars ($2.00) per M for pine and Seventy-five Cents ($.75) per M for larch. The contract called for the deposit of $25,000 earnest money, $10,000 of which was payable upon its execution and the balance at the rate of $1 per M on the first 15 million feet of timber removed. In addition, the vendee agreed to pay not less than $1,000 each month until the total, together with the guarantee fund, equalled the agreed consideration. For the purpose of determining gain or loss respondent treated this transaction as an installment sale. The total consideration to be received under this contract is $268,632, less selling costs (cruising) $3,600, or $265,032. 17,968 of the acres sold were acquired prior to March 1, 1913, and 1,320.5 acres subsequent to that date. The cost of the 1,320.5 acres was $8,324.81. Payments received under this contract during the year 1941 amounted to $24,563.25, and collection fees and expense aggregated $1,473.79. Payments received during 1942 amounted to $14,768 and collection fees and commissions aggregated $705.47. On November 19, 1941, another *31 contract between the bank and the Pilot Rock Lumber Co. was executed in which the seller agreed to sell and the buyer to purchase "all of the real property, including the timber standing, lying and being thereon," shown on an exhibit attached to the agreement. The total consideration was to be fixed by the quantity of merchantable timber, to be determined by joint cruises, at a base purchase price of $2 per M of pine and $.75 per M of larch timber, plus an overage purchase price for pine timber determined in accordance with current selling prices. In addition to cruising the timber, the cruisers, under the terms of the agreement, were to divide the tract into units, each containing one or more 40-acre governmental subdivisions, and into logging areas, each of which was to contain one or more units. The total acreage covered by this contract was 12,119.48. A down payment of $10,000 was to constitute a guarantee fund to be applied as the final payment for the last timber to be released under the contract. The balance was to be paid as each unit was released for cutting. For the purpose of computing gain or loss on this sale respondent treated each payment, including the down payment, *32 as a separate sale. Pursuant to the provisions of this contract, 960 acres acquired prior to March 1, 1913, were deeded to the vendee during 1941, $16,264.04 being paid to the petitioner out of which collection fees aggregating $162.63 were paid to the bank. During 1942, 2,000 acres, acquired prior to March 1, 1913, were deeded, $40,463.56 being paid to petitioner out of which cruising costs and fees to the bank were paid, aggregating $2,218.06. Petitioner also made two miscellaneous sales not covered by the contracts referred to above. During 1940, it sold to Walter Blackburn 80 acres located in Morrow County for $1,000. This property had been acquired prior to March 1, 1913. During 1941, it sold to the Pilot Rock Lumber Co. 547.35 acres for $10,550, which had also been acquired prior to March 1, 1913. The several contracts of sale cover all of the timberlands acquired by petitioner before and after March 1, 1913. The bank, as trustee, received the payments made by the vendees. They were credited to the syndicate account on its records, and whenever sizable amounts were accumulated distributions were made to the certificate holders. In accordance with the provisions of the contracts, *33 the bank executed and delivered deeds to the lands to the vendees. Respondent determined that the petitioner received income and was entitled to deductions, as follows: 1919
1922
1932
1933
1935
1936
Rents received
$3,996.20
$2,600.00
$5,494.16
$6,069.19
$9,550.00
$9,568.99
Taxable interest
on U.S.
bonds
145.81
360.00
Sundry income
57.30
.12
53.00
Total income
$3,996.20
$2,657.30
$5,494.16
$6,069.19
$9,695.93
$9,981.99
Expenses
63.62
100.40
1,145.78
272.83
8,213.67
9,216.38
Depreciation
259.75
Loss on bonds
185.75
Total Deductions
$ 63.62
$ 360.15
$1,145.78
$ 272.83
$8,399.42
$9,216.38
Net Income
$3,932.58
$2,297.15
$4,348.38
$5,796.36
$1,296.51
$ 765.61
1937
Rents received
$10,437.87
Taxable interest on U.S.
432.08
bonds
Sundry income
192.00
Total income
$11,061.95
Expenses
9,053.38
Depreciation
Loss on bonds
Total Deductions
$ 9,053.38
Net Income
$ 2,008.57
Petitioner filed no Federal income tax or excess-profits tax returns for the years listed above. For the calendar year 1938 petitioner filed a fiduciary return, Form 1041, reporting *34 receipt of $9,000 rental (grazing), and income of $101.14 from sundry sales of wood. It claimed deductions aggregating $9,463.64, reporting a loss of $362.50. This return was signed by W. E. Price, assistant trust officer of the bank. For the year 1939 petitioner filed a return upon the form prepared for the use of an individual [Form 1040], which was signed by Griswold as "Manager Eastern Oregon Timber Syndicate." Grazing land rentals of $9,200 were reported and deductions aggregating $24,179.47 were claimed. For the year 1940 a similar return was filed, signed by Griswold as "Managing Trustee," reporting receipt of grazing rentals of $9,527.86, total income of $9,548.65 and claiming deductions aggregating $10,199.35. A schedule in the last-mentioned return stated that petitioner's financial affairs extended back to 1907, when it acquired several large tracts of land in Morrow, Umatilla, and Grant Counties, in Eastern Oregon, "as an investment for resale"; that there were various sales contracts running for many years into the future; that the taxpayer elected to report the gains, if any, on the installment basis; that information would have to be obtained regarding the 1913 basis; *35 and that an amended return would be filed. For the year 1941 petitioner filed returns on Form 1040 (individual) and on Form 1120 (corporation), signed by Alan Brackinreed as attorney in fact, reporting income from interest of $1,666.26, rents $4,750, a capital loss of $975.07 from sales of land (using as the basis the March 1, 1913 value as shown by its books), and claiming as deductions taxes paid of $3,792.61, and trustee's expenses and other expenses paid through the "Auxiliary" bank account aggregating $10,096.33. The return stated that several sales of land had been made which were not reported but that the necessary data would be assembled and submitted as soon as completed. An attached power of attorney to Brackinreed and Robert T. Jacob, was signed by Griswold as trustee for petitioner and confirmed by the bank, as trustee. The respondent determined, inter alia, that petitioner realized gain in 1941 from the sales of its timberlands during that year in the amount of $20,860.75. For 1942, petitioner filed a return on Form 1040 (individual) and also on Form 1120 (corporation), signed by Brackinreed as attorney in fact. In these returns income in the total amount of $4,171.50 *36 was reported, composed of interest $1,489.29, rent $1,577.17, capital gain of $876.07 from sales of timberlands, and a refund of land sales experses of $228.97. Deductions aggregating $6,077.38 were claimed, the result of all operations being shown as a loss of $1,905.88. Attached to the return is a schedule giving data on the various sales contracts. The respondent determined that during 1942 petitioer realized a net gain of $30,070.20 from the sale of timber and timberlands. The fair market value of the lands owned by petitioner on March 1, 1913 was $2 per acre and the fair market value of the timber thereon was $16 per acre, an aggregate of $18 per acre. Opinion The first issue is whether respondent erred in determining that petitioner, during the taxable years, was an association taxable as a corporation. If this issue is decided against petitioner then it becomes necessary to determine whether gain was realized or loss sustained upon the disposition of timber properties and, if a gain, the amount thereof. The principal factor in this determination is the fair market value on March 1, 1913, of the property sold. Preceding the introduction of evidence petitioner moved for *37 judgment on the pleadings on the ground that respondent, by his answers, had raised no issue of fact with respect to the allegations in the petitions upon which the question of taxable corporate entity was predicated. The motion was denied. Upon brief petitioner argues that the ruling was erroneous. Further consideration has been given to the question but it is believed the ruling should be adhered to. Extended discussion of this phase of the controversy need not be made. In each deficiency notice it was held that petitioner was an association taxable as a corporation. Each petition alleges that the petitioner was a partnership as the term is defined in the internal revenue act. This allegation is denied in the several answers. Each petition also alleges that the Commissioner erred in determining that petitioner during the taxable years was an association taxable as a corporation. This allegation is likewise denied in the several answers. Some of the facts set out in the petitions - that a syndicate referred to by the name of Eastern Oregon Timber Syndicate was formed prior to the taxable years; that it obtained capital from divers persons and in that connection issued "Certificates *38 of Beneficial Interest" in the form set out in the petition; and that the timberlands were purchased with said funds and the titles thereto were vested in the trustee - were admitted in the answers. Other facts, deemed by petitioner to be pertinent to the issue and set out in the several petitions, were "denied for lack of sufficient information or knowledge upon the basis of which to form a belief as to the truth or falsity thereof." Petitioner's theory appears to be that respondent's answers are tantamount to judicial admissions by him that he does not know what the facts with reference to its organization and operation are and therefore that his determinations were arbitrary and capricious. We do not agree with this interpretation. Issues triable by this tribunal were drawn and should be determined upon the merits. Did the Commissioner err in determining that petitioner, during the taxable years, was an association taxable as a corporation? Petitioner contends that this question should be answered in the affirmative. Respondent insists he committed no error in making his determination. The basic question whether a syndicate is taxable as an association or as a partnership, *39 notwithstanding the many cases which have been decided, is still a difficult one; for, as pointed out in the pole star case of , "* * * it is impossible in the nature of things to translate the statutory concept of 'association' into a particularity of detail that would fix the status of every sort of enterprise or organization which ingenuity may create * * *." Cf. ; ; and . The tests so carefully laid down in the group of cases cited above may be generalized: Was there a business purpose as distinguished from a mere holding of title, centralized management, continuity of existence, shares, certificates or other evidence of ownership capable of being sold or transmitted without affecting the enterprise, limitation of personal liability, use of corporate form, etc.? Identity to a corporation or the presence of all of the attributes suggested by the preceding question is not required nor is "mere procedure a controlling test." The essence of the inquiry to be made *40 is always whether the entity bears sufficient resemblance to a corporation to justify taxing it as such. The well-prepared briefs of the parties analyze many of the decided cases and petitioner insists that none of the attributes referred to above and in the group of cases cited supra have been shown to be present. We shall not attempt to discuss the argument in detail. Brief reference to some of it, however, will not be amiss. One of petitioner's contentions is that it was not organized "as a medium for the carrying on of a business enterprise and sharing its gains." It urges that it merely bought property to be held for an enhancement in value. The evidence, however, summarized in the findings, shows that it engaged in many business transactions. Between 1907 and 1919 it made 240 purchases of small units of timberlands, acquiring an aggregate of more than 50,000 acres. It realized substantial income from leasing the lands and ultimately sold them in several tracts. It purchased bonds, employed help, carried on many negotiations looking to the making "of any sale or sales", paid salaries and commissions for services rendered, cruised the property, took steps to protect it against *41 fires and beetle infestation, appointed attorneys-in-fact to represent it, employed accountants, maintained bank accounts, filed income tax returns, kept records recording transfers of beneficial interests which had been issued, provided for succession to the "managing agents" Griswold and Mills, empowered the passive trustee to become, as it did become, an active trustee, and authorized it to sell the real and personal property and distribute the proceeds. This brief and incomplete summarization of the facts as to which there is no substantial dispute seems to require that conclusion be reached petitioner bore enough resemblance to a corporation to justify taxing it as such. We have not overlooked petitioner's argument to the effect that the certificates indicate a relationship of debtor and creditor between the entity and the holders rather than a relationship analogous to that of stockholders. In this connection it cites, inter alia, the group of cases applying the rationale of , and similar cases. In our judgment, however, the holders of the beneficial certificates in this case were actually participants in the venture *42 rather than creditors. It has been stated that Where one advances money for a business enterprise, depending upon the hazards of the business as to whether he will receive the return of his principal or receive any profit thereon, he becomes a shareholder in the corporation. , affd. ; , affd. . See also ; , affd. , certiorari denied . Petitioner's alternative contention, advanced only in the event that we hold, as we have, that it was an association taxable as a corporation, is that so far as the years 1941 and 1942 are concerned, it was not engaged in any business enterprise but was merely collecting the proceeds of sales consummated between November 1938 and November 1941 and distributing them to the holders of certificates of beneficial interest. In our judgment it cannot be relieved from tax on the basis suggested. The *43 full extent of petitioner's activities during 1941 and 1942 have been set forth in our findings and need not be repeated. It is fundamental that determination whether an entity is or is not taxable as an association must be made from the nature and purpose of the cooperative undertaking. "The parties are not at liberty to say that their purpose was other or narrower than that which they formally set forth in the instrument under which their activities were conducted." Petitioner was organized for the purpose of buying and selling timberlands at a profit. Curtailment of its activities during the years 1941 and 1942 did not affect any change in the purpose for which it had been organized or in its status as an association taxable as a corporation. Cf. ; . The next question is the basis for gain or loss on the timber and timberlands sold. The parties agree that as to the timber and timberlands purchased prior to March 1, 1913, the value as of that date is the proper basis *44 and that as to the timber and timberlands purchased thereafter the basis is cost. On the theory that the timber constituted the chief value of the property and that timber was sold between 1938 and 1941 at agreed prices per M, respondent made his determinations of gains, using as the basis for properties acquired before and after March 1, 1913, the following amounts: Before 1913
After 1913
Land
$2.00 per acre
$2.00 per acre
Pine Timber
1.25 per M. bd. ft.
0.9218 per M. bd. ft.
Larch Timber
.375 per M. bd. ft.
0.3980 per M. bd. ft.
Petitioner contends that respondent erred in determining that the March 1, 1913 fair market value of the pine timber, separate from the land, was $1.25 per M instead of $2 per M; in segregating the timber and land for the purpose of valuation; and in failing to determine that the fair market value of the timberland and its appurtenances as a whole was $22 per acre as of March 1, 1913. It urges that it has introduced competent and credible evidence making such proof. Petitioner also urges that the value of the timber alone is only an element entering into the determination of the value of the timberland as a unit; that the *45 fair market value of the property on March 1, 1913, must be based on its condition at that date regardless of subsequent changes; that the quantity of timber on the lands at that time is the relevant fact; that the cruises made in 1938-1941 were limited to certain specifications by the contracts of sale and were not intended to reflect and do not reflect the quantity of timber on the lands in 1913; and that the provision in the contracts for cruising timber of certain specifications was merely for the purpose of computing the purchase price to be paid for the land and its appurtenances rather than for the particular timber described. The obvious purpose of the Penegor cruise, referred to in the findings, was to enable Griswold and Mills to decide what should be paid for the various tracts. This depended upon the amount of timber on the lands, since it constituted their chief value. What they purchased, however, was not timber, separate and apart from the lands, but the lands, which included the appurtenances such as timber, mineral rights, etc. Most of the units purchased were 160 acre tracts, the average amount paid being approximately $9 per acre. The acreage acquired prior to *46 March 1, 1913, amounted to 47,417, and that acquired after that date to 3,809, a total of 51,226.41. According to the Penegor cruise they contained 559,392 M of pine and 37,809 M of larch. Petitioner computes the cost as follows: Purchase price paid to owners prior
to 3-1-13
$423,558.05
Purchase price paid to owners after
3-1-13
26,065.40
Total paid to owners
$449,623.45
W. F. Slaughter bonus
31,020.07
Expenses prior to 3-1-13
17,611.99
Taxes paid before 3-1-13
4,280.60
Total
$502,536.11
The evidence concerning the W. F. Slaughter bonus and the expenses paid prior to March 1, 1913 is meager. We assume, without deciding, that they and the taxes paid prior to that date represented capital. Our question, however, is not how much had been invested in the property prior to March 1, 1913, but what was then the value of the property owned. No sale of any of the lands acquired by petitioner took place prior to 1938. During the years 1938 to 1941 inclusive contracts were entered into for the sale of the timberlands, the pertinent provisions of which have been set out in our findings. Although the contracts provided that the vendees should pay a specified *47 price per M for merchantable pine or for merchantable pine and larch, it is apparent from the wording of each that the vendees were to acquire for the specified consideration not timber alone, separate and apart from the lands, but the land and all of its appurtenances, including the pine and larch, whether merchantable or not. The only exception was that in some of the contracts mineral rights were reserved. Respondent's method of computing the gain realized in 1941 from sales under Kinzua contract #1, shown below, is typical of the method used by him in determining gain realized under all of the contracts. 1941
Footage
Price
Amount
Sales - Timberlands - Pine
5,611 M
2.16 $12,119.76
Pine
5,381 M
2.20 11,838.20
Total sales price
$23,957.96
BASIS: Acquired prior to 3-1-13: Pine
10,992 M
1.25 13,740.00
Larch
312 M
.375
117.00
Land
1,712 M
2.00 3,424.00
Total basis
$17,281.00
Gain 1941
6,676.96
Less: Cruising Costs
259.35
Net gain 1941
$ 6,417.61
The parties are in apparent agreement as to the amounts realized and to be realized from the sales. At any rate there is no evidence from *48 which we can determine that other or different amounts than those determined by the respondent have been or will be received. The principal disagreement, as previously indicated, is the basis. Thus, while petitioner agrees that the land alone had a basis of $2 per acre on March 1, 1913, it does not agree that the pine timber had a fair market value of $1.25 per M on that date or that there was only 10,992M pine on the 1,712 acres at the time they were acquired. This footage is based on a cruise made pursuant to the terms of the contract of November 1, 1938. According to the petitioner, the amount of timber on its timberlands as of March 1, 1913, is more accurately indicated by the Penegor cruise, made at about the time the lands were being acquired. The evidence convinces us that the amount of merchantable timber determined by the cruises made pursuant to the sales contracts in 1938 and later years does not reflect the amount of timber on the lands in 1913. During the years intervening between 1913 and the dates of the sales a substantial number of trees had been killed as a result of beetle infestation, drought, and other causes. The principal damage was caused by beetle infestation. *49 Some idea of the extent of this damage may be gleaned from the following excerpts from reports of the cruises. One dated June 6, 1941, covering the cruise of 4,793 acres states: The ponderosa pine volume is. broken down into three parts, i.e., first, merchantable pine; second, non-merchantable pine; and third, dead pine. The pine in the non-merchantable class includes the limby and low quality trees that are unprofitable to log, and the dead pine includes those trees that have died in the last fifteen years either from pine beetle attack or drought. The sum of these three breakdowns show the original volume of green pine timber that stood on these lands approximately fifteen years ago. It will be noted, as shown in the summary, that over 18% of the total amount of pine timber has died within the last fifteen years. Another dated June 30, 1941, covering a cruise of 10,000,000 feet of Ponderosa pine states: Considerable pine beetle infestation has occurred in this timber. In some places the pine was hit harder than others, for instance in section 9, 1,499 M feet or 26.2 per cent of timber has been killed in the last twenty years. On the entire area cruised this year about 23 per *50 cent of the timber is dead. Witnesses testified that beetle infestation first became noticeable in the Eastern Oregon timber area in 1920 or 1921; that it is possible for such infestation to set in without immediately becoming evident; and that the first indication that it has done so is dying needles on the trees. After 1931 damage from beetle infestation became very pronounced, and, according to one witness, a conservative estimate would be that it killed one-fourth of the timber. Another witness estimated twenty percent. The timber in trees killed by beetle infestation is not used for general logging. The dead timber found by the cruisers who estimated the amount of merchantable timber pursuant to the provisions of the sales contracts, was not included in their reports. This timber was included by Penegor in his cruise inasmuch as beetle infestation had not then set in. In some instances larch (tamarack) timber was not cruised under the sales contracts and under Kinzua contract # 1 only timber 16inch diameter at the base and 10inch at the top was cruised, except that where 32 foot logs could be obtained timber 8inch at the top was cruised while Penegor had cruised all timber *51 12inch in diameter at the base. A similar difference existed under the Kinzua contract No. 2. In view of the amount of trees killed by beetle infestation and other causes and the different standards used by the cruisers it is not surprising that there is a substantial dscrepancy in the amount of timber shown by the Penegor cruise and by the cruises made under the sales contracts. Respondent disputes the accuracy of the Penegor cruise; but spot or check cruises made in 1927 and 1929, by a cruiser who was a broker and interested in negotiating a sale of the timberlands, disclosed that it was substantially correct. Our best judgment therefore is that both the Penegor cruise and the cruises made pursuant to the sales contracts reasonably accurately reflect the amount of timber on the lands at the times they were made under the different standards used. The difference in footage of timber on the lands determined by Penegor at the time they were acquired and other cruisers at the time they were sold makes it practically impossible to determine petitioner's gain or loss on a footage basis. Moreover, such a determination, even if it could be made with reasonable acuracy, would result in *52 a disregard of realities because what petitioner purchased was timberlands with all appurtenances, including timber, and that is what it sold under the sales contracts. The cruises provided for in the sales contracts and the specified price of so much per M for the timber were merely for the purpose of computing the purchase price to be paid for the land and all appurtenances, and not for the particular timber described. Petitioner's gain or loss can best be computed, therefore, by comparing the price received for the acreage sold with its March 1, 1913 value, if acquired prior to that date, or with its cost, if acquired subsequent thereto. The amounts received for the acreage sold and the cost of acreage acquired subsequent to March 1, 1913 are set out in our findings. We will therefore confine our discussion to the fair market value as of March 1, 1913, of the acreage acquired prior to that date. The best evidence of value, of course, would be what similar acreages of comparable timberlands sold for on or about March 1, 1913; but no evidence of such sales was presented and apparently none were made. We do know, however, that prior to that date petitioner purchased units of 40, *53 160, and 320 acres at approximately $9 per acre. We also have the testimony of well qualified witnesses that the consolidation of small units into a large tract that would be attractive to mill owners had the effect of substantially increasing the value of the acreage. According to one witness the effect of consolidation would be to double the value of the acreage. Another witness expressed the opinion the value would be increased two or three times. The element of transportation is an important factor to be taken into consideration in determining value, and in 1913 the nearest railroad was from 20 to 25 miles distant from petitioner's properties. No trucking roads had been constructed at that time; and the plan of one railroad to extend its line out to petitioner's timber was abandoned in 1910 or 1911. Two witnesses for petitioner testified as to the value of its lands and timber. One stated that on March 1, 1913, an assembled tract of timber in Eastern Oregon[2] would be worth not less than $2 to $2.50 per M. He had bought, sold and handled timberlands in areas bordering petitioner's for approximately 50 years, and had kept himself posted on timber holdings and sales. He was well *54 acquainted with petitioner's lands both before and after 1913. He considered the timber to be "the softest, whitest and lightest lumber, and should bring more per thousand feet than some others." He testified that logging conditions were favorable, and that when small timber claims are consolidated and assembled into large tracts, the consolidated area is worth 2 or 3 times as much as the individual claims. He mentioned the following sales: 1910. 225,000,000 ft. of pine timber (20,000 acres) sold to Baker White Pine Lumber Company at $3.00 per M. Price included land and timber. Located near Sumpter and 30 miles from Baker, Oregon. Purchaser built a 20-mile spur from main line of Sumpter Valley Railroad into the timber. 1911. 53,000 acres, located about 15 miles from petitioner's holdings, sold by Kinzua Timber Co. to Kinzua Pine Mills Co. at price in excess of $2.50 per M ft. Spur line had to be built into the woods, and was not more accessible to railroad than petitioner's lands. 1910. 12,000 acres, located near town of Austin (now known as Bates) sold to OregonLumber Company at $2.12 per M ft. *55 Another witness expressed the opinion that petitioner's lands, including the timber thereon, had a fair market value on March 1, 1913, of $20 to $22 per acre. He had bought and sold timberlands for about 43 years in eastern Oregon and Washington. He referred to a sale in 1910 of 35,000 acres, 75 miles from petitioner's lands and with slightly better logging conditions, at $25 per acre; to a sale in 1924 of $20,000 acres in southern Oregon at $40 per acre; and to a sale in 1910 of timberlands containing timber not as good as that on petitioner's lands at $25 to $30 per acre. He did not take the 1924 transaction into consideration in formulating his opinion as to the value of petitioner's lands in 1913. The market price for timberlands in eastern Oregon increased between 1913 and 1924. Other evidence submitted by petitioner discloses that in 1913 Griswold was asking $30 to $35 an acre for petitioner's timberlands. In the books which he kept the March 1, 1913 value of all lands and timber was stated to be as follows: 560,082 M ft. of pine at $2.00 per M
$1,120,164.00
37,425 M ft. of tamarack at $1.00 per
M
37,425.00
51,224.84 acres of land at $2.25 per
acre
128,062.10
*56 One witness, a consulting forester, was called by respondent. He expressed no opinion as to the fair market value on March 1, 1913, of petitioner's lands and the timber thereon. He was familiar with eastern Oregon timberland, however, and had made a trip through the lands formerly owned by petitioner about two weeks prior to the trial to observe the kind and stand of the timber, the character of the ground on which it was standing, and the opportunity to construct transportation facilities. He testified that the nearest points railroads had been constructed in 1913 to petitioner's lands were Condon, Heppner, and Pilot Rock; that the stand per acre in 1913 was heavy enough to justify an operation; that it was somewhere, as shown by the Penegor cruise, in the neighborhood of 11,000 feet of pine per acre; that the ground on which the timber stood was good to fair logging ground, averaging fairly good; that the opportunity to build railroads to the timber was partly reasonably good and partly somewhat tough; that proportionately a rather high mileage of railroad system would be necessary to get to and remove the timber; that about 60 percent of the timber is in the area around Dale and *57 about 40 percent in the area to the west; that the westerly unit is 25 to 30 miles from the railroad at Heppner and the Dale unit about 50 miles from the railroad at Pilot Rock; that not all of the tracts could have been operated from one mill site and efficient operation required that at least two be established; that he estimated the gross volume of dead timber to be probably not less than 7 or 8 percent and not over 20 percent; that ordinarily beetle infestation does not appear solely in one year; and that it is normal for ponderosa pine forests to have more or less beetle work going on, but sometimes it is worse than others. He also testified that ponderosa pine is a soft, rather light lumber, which is highly prized as one of the best lumbers; that larch or tamarack is a heavier, harder lumber which is quite difficult to dry except in narrow widths; and that larch would ordinarily sell at from 60 to 70 percent of the price of pine. Notwithstanding limited transportation facilities, the witness was of the opinion that there was a market for Oregon timberlands in 1913 consisting of mill owners who were acquiring timber for their own use and others who were acquiring timber for speculative *58 purposes. In a book recording his studies of "Timber Ownership and Lumber Production in the Inland Empire", he made the following statement: Standing timber rose rapidly in price from 1900 to 1907, reaching an average price of about $2 per thousand feet. The price fluctuated very little from 1907 to 1914, but since then has perhaps fallen off slightly. The witness also recalled that the government in 1913 advertised for sale 100,000,000 feet of ponderosa pine (land not included) located in an area 15 miles north of Enterprise, Oregon, at $2.50 per M ft. This area was more compact than petitioner's timberlands and there was a railroad at Enterprise at the time. This was a "pay-as-you-cut" transaction and buyers in general are willing to pay considerably more under such circumstances than when they purchased outright. After careful consideration of all the evidence our best judgment is that the fair market value as of March 1, 1913, of that part of petitioner's timberlands, including timber, acquired prior to that date, is $18 per acre, and we have made such a finding. We have also made findings showing cost of lands and timber acquired subsequent to March 1, 1913, and amounts *59 realized from sales in 1941 and 1942, the only years here involved in which petitioner received income from sales of its timber and timberlands. Petitioner makes no contention that the respondent in his determinations for the years 1919, 1922, 1932, 1933, 1935, 1936 and 1937 erroneously stated the amount of its income or deductions. In its petition it alleges that the respondent erred in determining that it is an association taxable as a corporation, in failing and refusing to determine that it could not realize any gain until all funds advanced by certificate holders, together with interest thereon, were paid in full, and that no profits were realized during these years because such obligation had not been liquidated. We have heretofore held that petitioner is an association taxable as a corporation, and, as such, it is taxable upon the net income realized from its operations regardless of the fact that the certificate holders had not recouped the amount of their investments. Respondent's determinations of deficiencies in income and excess-profits taxes for these years are therefore approved. There remains the question of penalties asserted for the years 1919, 1922, 1932, 1933, *60 1935, 1936 and 1937. Petitioner filed no returns for these years, and, being an association taxable as a corporation, it should have done so. Under the provisions of the Revenue Acts of 1918, 1921, 1932 and 1934, the 25 per centum addition to tax provided for failure to file a return may be avoided if a return is filed after the due date and the failure is due to reasonable cause. Petitioner has not met these conditions. Section 291 of the Revenue Act of 1936 also requires a showing of reasonable cause, to avoid the 25 per centum addition to tax, where no return is filed. No reasonable cause for failure to file returns for the years 1936 and 1937 has been shown. Our conclusion is that the respondent's imposition of delinquency penalties for the years in which no returns were filed must be sustained. Cf. . Decision will be entered in Docket 3186 for the respondent. Decision will be entered in Dockets 3187 and 3188 under Rule 50. Footnotes
1. M, as hereinafter used, means thousand board feet of lumber.↩
2. According to the Penegor cruise and the testimony of the witnesses petitioner's lands averaged approximately 11,000 ft. of pine timber to the acre.↩